IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GEORGE EDWIN JOSEPH,      )
     )
     Petitioner,      )
     )
     v.      )      Case No.  4:19-CV-03232-AGF
     )
MICHELE BUCKNER,      )
     )
     Respondent.      )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner George E. Joseph for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   In July 2015, Petitioner was convicted by a jury of two counts of first-degree murder, and one count of armed criminal action.  Petitioner was sentenced to life without parole for both counts of first-degree murder and fifty years on the count of armed criminal action, with all three sentences to run consecutively.

In his federal habeas petition, Petitioner asserts several claims of trial court error and constitutional violations related to the interrogation police conducted while he was hospitalized.  For the reasons set forth below, habeas relief will be denied.

## BACKGROUND

This case arises out of the murder of Petitioner's wife (Mary Joseph) and son (Matthew Joseph) at Petitioner's home in Cape Girardeau on May 30, 2013.  Petitioner was charged with two counts of first-degree murder, and one count of armed criminal

action.  The pertinent facts, as summarized by the Missouri Court of Appeals in

Petitioner's direct appeal, state the following:

> On the morning of May 30, 2013, at [Petitioner's] home in Cape Girardeau, the bodies of Defendant's wife (Mary Joseph) and son (Matthew Joseph) were found in their beds, wrapped in sheets and covered by pillows, with rosaries placed on top of them.  They were both shot in the back of their heads three times with bullets fired from a .22 caliber gun.  There was no sign of forced entry into the home and the forensic pathologist who performed the autopsies on the victims opined they died while sleeping.  [Petitioner] was found sitting by the pool, covered in blood.  He later made statements to medical personnel and police officers that he had shot himself in the pool.  He sustained serious injuries to his head and was taken immediately to a local hospital.  He was then flown to Barnes Jewish hospital ("the hospital"), where he underwent two surgeries and was placed on a ventilator in the Intensive Care Unit. Police recovered a .22 caliber gun from the pool alongside a spent casing.[1]
>
> On June 4, 2013, the hospital called Sergeant Don Perry ("Officer Perry")[2] to inform him that [Petitioner] had been removed from the ventilator and was able to speak. Officer Perry and Sergeant Jeff Bonham ("Officer Bonham") drove to St. Louis to interview [Petitioner] about what occurred at his home on May 30 and collect DNA evidence.  In order to visit [Petitioner], all persons, including the police, had to go through the hospital's security. Pursuant to the hospital's policy for crime victims, [Petitioner] was located on a secure floor with limited outside access.
>
> The officers donned protective suits and recorded their interview with a video camera.  Before the officers began questioning [Petitioner], he asked to speak with his attorney.  [Petitioner] repeatedly told the officers he did not want to answer any questions without his attorney, and at one point asked them to stop questioning him without his attorney present.  However, the officers continued to question [Petitioner], and after about twenty minutes he stated: "There's nobody else involved. I'm not going to shoot anybody."  The officers asked for more details about what happened but [Petitioner] did not

---

[1]     Police also recovered a second gun from the living room of Defendant's home. The State presented evidence at trial showing Defendant had borrowed both of these guns shortly before May 30.

[2]     Because the officers involved in this case have differing titles at different points in time, we will refer to them as "Officer" for clarity and ease of reading.  No disrespect is intended.

answer any more of their questions.  He told them at one point he would get out of the hospital soon and he would talk to them with his attorney.  Officer Perry stated "I don't know if you didn't want your family to go through the shame of the financial issues" to which [Petitioner] replied, "That's what it was."  The officers left [Petitioner] after questioning him for two hours.

As the officers left, they encountered [Petitioner's] family members and helped them gain access to [Petitioner's] hospital room.  The police informed the hospital's security who the family members were and that they needed to obtain [Petitioner's] signature in order to proceed with burying [Petitioner's] wife and son.  [Petitioner's] brother, Gerard Joseph, and brother-in-law, David Snell, visited him along with other family members.  Mr. Snell testified he was close to [Petitioner], and he was one of the first people to arrive at [Petitioner's] home on the morning of May 30 and discover the bodies of his nephew and sister-in-law.  Mr. Snell testified he visited [Petitioner] in the hospital shortly after the police left, and [Petitioner] told him, "He had to put them in a better place" and he "was so sorry."

On June 7, 2013, [Petitioner] was arrested when he was discharged from the hospital.  He was charged with two counts of murder in the first-degree in violation of § 565.020.  Defendant was also charged with one count of armed criminal action under § 571.015 for using a gun to kill Mary Joseph.

*State v. Joseph*, 515 S.W.3d 735, 740-41 (Mo. Ct. App. 2016).

**Pre-Trial**

Prior to trial, Petitioner filed two motions to suppress his statements made to the police at the hospital.

October 2013 Motion to Suppress

On October 13, 2013, the trial court heard Petitioner's first motion to suppress. Doc. No. 11-1, Mot. Hr'g Tr., at 11.  Petitioner's counsel, Bryan Greaser, argued that Petitioner was subjected to a custodial interrogation without being read his *Miranda* rights in violation of the Fifth Amendment, and that his statements were involuntary, in violation of the Fourteenth Amendment.  Doc. No. 11-6 at 4.  Prior to the hearing, the

3

trial court reviewed the video recording of the interview at the hospital.  Officer Perry

and Officer Bonham both testified at the hearing.  Officer Perry testified that when he and

Officer Bonham visited Petitioner at the hospital on June 4, 2013, there was no local law

enforcement involved, no hospital security involved, Petitioner was not under guard nor

was he in any way shackled or handcuffed to his hospital bed.  *See* Doc. No. 11-1 at 16-

17.  However, the trial court noted on the record, that upon reviewing the video evidence,

it was clear Petitioner was not going anywhere, and while Officer Perry told Petitioner he

could stop talking if he wanted to, it was clear Petitioner was not able to walk out of the

room in his condition.  *Id.* at 49.

Officer Perry stated that Petitioner was not going to be arrested that day, even if he

had given a detailed confession, largely in part due to his medical condition.  *Id.* at 18

("[Petitioner] was going to need greater medical attention than could be provided in a jail

setting.").  Officer Perry testified that Petitioner was conscious and alert for the entire

conversation, never asked the officers to leave, and even told the nurse that it was okay

for the Officers to be in his room.  *Id.* at 20-23, 30.  The officers were with Petitioner for

about two hours, but did not question him the entire time; the officers took fingerprints,

DNA swabs, spoke with medical staff, and even left the room at one point to speak to

each other.  *Id.* at 20.

Officer Perry also admitted that Petitioner asked for an attorney five to six times

during their conversation.  *Id.* at 21.  The officers did not leave the room or cease

questioning when Petitioner asked for an attorney.  When asked why they did not leave

the room or cease their interview, Officer Perry explained, "we were going to attempt to

see if he would consent to the buccal swabs and then try to persuade him through conversation the reasons why we wanted to talk with him at this point in time," and again reaffirmed that Petitioner was not in custody or restrained.  *Id.* at 22.  The officers asked Petitioner if he felt in any way threatened by them, or if he felt that he had been tricked, abused or mistreated in any way, and Petitioner indicated that he did not.  *Id.* at 30.

The officers informed Petitioner that his family members were on their way to the hospital, and offered to stay for his protection, but Petitioner indicated that he did not want them to stay, so the officers left before Petitioner's family members arrived.  *Id*. at 24.

The trial court found that Defendant's constitutional rights were not violated and denied the motion.  Doc. No. 11-6 at 4.

<u>June 2015 Motion to Suppress</u>

On June 12, 2015, Petitioner again sought to suppress his statements made to the police at the hospital.[3]  Defense counsel, Public Defender Cynthia Dryden, presented testimony from family members who visited Petitioner on June 4, 2013, after the officers left.  Petitioner's brother, Gerard Joseph, testified that Petitioner was "groggy, delirious, and delusional" on the day the officers questioned him.  Doc. No. 11-1 at 180.  Gerard Joseph also testified that the hospital requested an advance directive for Petitioner that day and a number of doctors, including what he believed to be the psychiatry department,

---

[3]     The Missouri Court of Appeals decision states that this motion was heard on May 14, 2015 (Doc. No. 11-6 at 4), but the trial court transcript indicates that this motion was heard on June 12, 2015.  Doc. No. 11-1 at 139.

evaluated Petitioner before they allowed him to sign the directive.  *Id*. at 181.

Petitioner's brother-in-law, David Snell, testified that Petitioner was awake and able to

speak on June 4th, although Petitioner later told Snell that he had been hallucinating and

he couldn't fully remember what happened when Snell visited him.

Defense counsel submitted Petitioner's medical records which indicated that on

June 5, 2013, Petitioner scored below normal on the "Montreal Cognitive Assessment,"

which indicated that he would benefit from further assessment and intervention in

memory, language, and executive functioning.  *Id.* at 188.  The records also indicated that

Defendant was on anti-seizure and neuroleptic medications on June 4, 2013.[4]  The

medical records generally indicated that Petitioner was alert and doing well, but there is a

note in his chart from the afternoon of June 4, 2013 in which a hospital staff member

indicated that Petitioner had "questionable comprehension" regarding instructions related

to his fall risk.  *Id*. at 190-91.

The trial court again denied Petitioner's motion to suppress.

**<u>Trial</u>**

A jury trial was held on July 20-23, 2015.  The officers recorded their June 4,

2013 interview with Petitioner at the hospital.  The jury was shown the entire video

during trial.  The transcript of the video was also admitted, but the jurors were instructed

to rely on the video, and the transcript was merely an aid.  Doc. No. 11-1, at 382; 1128-

---

[4]      The Missouri Court of Appeals decision states that evidence was presented that
Defendant was on amnesiac medication on the day the officers questioned him, but the
transcript indicates that he was only on the amnesiac while he was on the ventilator.  *See*
Doc. No 11-6 at 4; Doc. No 11-1 at 188-89.

30.  Officer Perry and Officer Bonham both testified at trial about the statements Petitioner gave during the interview at the hospital.  *See id*. 631-86, 1104-63.

Petitioner filed a motion for judgment of acquittal at the close of the State's evidence, and again at the close of all evidence, both of which were denied.  *Id.* at 1293; 1311.

On July 23, 2015, the jury returned a verdict of guilty on the two counts of first-degree murder (Counts I and II) and the count of armed criminal action (Count III).  On August 12, 2015, Petitioner filed a motion for a new trial.  Petitioner's motion was denied, and on September 18, 2015, the trial court sentenced Petitioner to life without parole on Counts I and II and to fifty years on Count III, with all three to run consecutively.  On September 24, 2015, Petitioner filed his notice of appeal.

**Direct Appeal**

On direct appeal, Petitioner, through appointed counsel, argued seven points of appeal.  Relevant here are Arguments I and II.[5]  Argument I claimed that the trial court clearly erred in denying Petitioner's motions to suppress statements and admitting at trial, over objection, his entire two-hour videotaped interrogation and the testimony of Officers Perry and Bonham regarding Petitioner's statements in the hospital because the statements were made during a custodial interrogation without *Miranda* warnings. Argument II claimed that the trial court clearly erred in denying Petitioner's motions to

---

[5]     The remaining arguments made in Petitioner's direct appeal were not raised in Petitioner's federal habeas petition, and thus are not relevant to this analysis.

suppress and admitting the above enumerated evidence because the statements were involuntary.

The Missouri Court of Appeals affirmed the decision of the trial court.  The appellate court found that the interview at the hospital constituted an interrogation, but Petitioner was not in custody, thus *Miranda* warnings were not triggered, nor were the officers required to terminate the interrogation when Petitioner asked for an attorney. Specifically, the appellate court determined that given the circumstances surrounding the interrogation, a reasonable person would have felt he was at liberty to terminate the interrogation.  The appellate court explained that Petitioner was not physically restrained by the officers; he was informed he could end the interview; he was not arrested at the end of the interview; a nurse asked the Petitioner if it was alright if the police spoke with him, to which he agreed; hospital staff checked on Petitioner throughout the interview and assured him they would be right outside if he needed them; Petitioner selectively answered their questions; Petitioner's answers were consistent, rational and coherent; there were breaks in questioning; and the officers did not persistently ask him questions about what happened.  Thus, the appellate court concluded, the circumstances surrounding the interrogation did not amount to a coercive environment that restrained his freedom to the same degree as a formal arrest, as such he was not in custody and therefore not entitled to invoke his *Miranda* rights, and as such, his Fifth Amendment rights were not abridged by admitting his incriminating statements into evidence.

The appellate court also found that Petitioner's statements were not coerced or involuntary.  Specifically, the appellate court determined that the totality of the

circumstances did not create a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions. The court explained that Petitioner was able to speak with the officers clearly; Petitioner repeatedly denied being in pain when asked by the officers and the nursing staff; he never lost consciousness; Petitioner told the officers he was involved in the deaths of his wife and son just twenty minutes into the interrogation; Petitioner was conscious, coherent, and medically stable; and finally, the fact that Petitioner chose to answer certain questions and not to answer others, showed his will was not "overborne" and he had the ability to make rational choices.  Thus, the appellate court determined that the trial court did not err in finding that Petitioner's statements were voluntary and admissible.

**State Habeas Petition**

On June 28, 2017, Petitioner filed a pro se habeas petition in the Circuit Court of Cape Girardeau County, Missouri, asserting claims for prosecutorial misconduct; evidence omitted by the state; and ineffective assistance of counsel related to the evidence investigation and witness examination.  An amended petition by appointed counsel was filed on September 26, 2017, to add a claim of ineffective assistance of counsel for the failure to request a *Daubert/Frye* hearing on the testimony of Kevin Winer regarding blood spatter analysis.  The State moved to dismiss the petition.

On December 13, 2017, the Circuit Court denied Petitioner's amended motion without an evidentiary hearing.  On September 3, 2018, Petitioner, through appointed counsel, appealed this ruling to the Missouri Court of Appeals.  On April 16, 2019, the appellate court affirmed the circuit court's ruling.

The arguments raised in Petitioner's state habeas petition were not raised in his federal habeas petition, as such these issues are not before this Court.

**Federal Habeas Petition**

Petitioner raises three grounds for federal habeas relief.  Petitioner asserts that (1) the State violated his *Miranda* rights while questioning him in the hospital as he was functionally "in custody," (2) the statements Petitioner made to the officers in the hospital were involuntary, and (3) his arrest warrant was based on "false, coerced, and inaccurate self-incriminating statements" made at the hospital, in violation of his Fifth Amendment rights.

Respondent argues that Petitioner's claims are without merit because (1) Petitioner was not in custody when hospitalized and (2) Petitioner's statements to the officers were voluntary and his Fifth Amendment rights were not otherwise violated.  Respondent acknowledges that the petition is timely under 28 U.S.C. § 2244(d)(1).

Petitioner filed a traverse which raised claims of actual innocence and reasserted his arguments that he was in custody at the hospital and his statements made to the police were involuntary.

## DISCUSSION

**Legal Standard**

Federal habeas relief is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that habeas

relief cannot be granted unless the state court's adjudication:

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

In order to show that the state court's decision was contrary to or an unreasonable application of federal law, the petitioner must show that the claimed violation was based on a federal law that was clearly established by the Supreme Court *at the time* the state court decided these claims. *Williams v. Taylor*, 529 U.S. 362, 380-81 (2000). Further, if the correct legal standard is applied to a claim, but there is no Supreme Court case with similar facts, the state court's rejection of the claim is not "contrary" to federal law. *Id*. at 385-86; 405-06.

The unreasonable application standard applies if the state court has applied the correct standard, but applied it to the facts of the case in an unreasonable manner. *Id*. at 409-10. An unreasonable application "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017).

The state's factual determinations are presumed correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *Nicklasson v. Roper*, 491 F.3d 830, 834 (8th Cir. 2007); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

The existence of some contrary evidence does not establish that a state court's factual determination was unreasonable, nor is the determination unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  In the context of custodial interrogations under *Miranda*, the Supreme Court has held that relief is available under § 2254 "only if the state court's decision is objectively unreasonable."  *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004).

**Ground 1: Violation of Fifth Amendment Rights at Hospital Interrogation**

In Petitioner's first claim, he argues that he was effectively "in custody" during his interrogation at the hospital because the hospital acted as the State's custodial agent, and he was not allowed to contact his brother or his attorney.  Doc. No. 1 at 5.  Petitioner also argues that he was unable to leave to his room due to his physical condition and because the hospital stationed a non-medical employee to sit in his room.  *Id.* at 6.

Here, as noted above, the state appellate court (hereinafter, "state court") concluded that Petitioner was not "in custody" during the interrogation at the hospital, and thus he was not entitled to invoke his *Miranda* rights nor were his Fifth Amendment rights abridged by admitting his incriminating statements into evidence.  The factual basis for the reasons relied upon by the state court in support of this conclusion is supported by the video of the June 3, 2014 interrogation, and the testimony at both suppression hearings and the trial.  The question remains whether the state court's decision constituted an ureasonable application of clearly established federal law.  *See Yarborough*, 541 U.S. at 664 (2004).  In *Yarborough*, the Supreme Court explained that

12

this is a general test, where substantial judgment is demanded in applying the law to the facts of a given case; a federal habeas court, therefore, must provide ample leeway to a state court in reaching a reasonable decision.  *Id.* at 665.

*Miranda v. Arizona* recognized that "in-custody interrogation[s]" place "inherently compelling pressures" on the individuals interrogated.  384 U.S. 436, 467 (1966).  Thus, in order to safeguard "the individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation."  *Thompson v. Keohane,* 516 U.S. 99, 107 (1995) (citing *Miranda*, 384 U.S. at 444).  However, *Miranda* warnings are not required in non-custodial interrogations.

The state court found that the conversation between the officers and Petitioner in the hospital constituted an interrogation.  The Court agrees.

> "[T[he officer clearly interrogated him…"interrogation" includes "any words or actions on the part of the police…that the police should know are reasonably likely to elicit an incriminating response from the suspect," Officers Perry and Bonham asked [Petitioner] numerous questions throughout their interview that [were] reasonably likely to elicit an incriminating statement…[t]hus the two-hour "interview" was an interrogation."

Doc. No. 11-6 at 6 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-301).

Thus, the analysis is limited to whether the interrogation was custodial.  In determining whether a person is in custody under *Miranda*, the Court must make two discrete inquiries: "[f]irst, what were the circumstances surrounding the interrogation;

13

and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson,* 516 U.S. at 112. The court must evaluate the totality of the circumstances surrounding the interrogation. Relevant factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citations omitted). The defendant bears the burden of proving custodial status. *See U.S. v. Jorgenson*, 871 F.2d 725, 729 (8th Cir. 1989).

The Eighth Circuit has also set forth a non-exhaustive list of factors to determine whether an individual was in custody at the time of questioning:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

The ultimate inquiry in determining custody is whether the restraint on the suspect's movement rose to the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

The record before the Court establishes that Petitioner was not physically restrained by the police; he was informed he could end the interrogation and he had the

right not to speak with the officers; he affirmatively agreed to speak with the police when the nurse asked him; the nursing staff told him they would be right outside if he needed them; he was conscious and alert during the interrogation and repeatedly told the officers and nursing staff he felt fine when asked; the nursing staff checked on him during the interrogation; he was not arrested at the termination of the interrogation; the interrogation was only two hours long; he was not subject to continuous questioning about the incident; he once affirmatively stated that he did not want to talk to the police, but then consented to them collecting fingerprints and DNA evidence and continued to answer their questions; petitioner repeatedly requested to speak to his attorney; petitioner stated at one point that he could not think straight and was unwell; and Petitioner was unlikely to be able to leave the room given his medical state.

Petitioner's federal habeas petition focuses primarily on the fact that he was on "Silent Status" at the hospital and was denied any contact with his brother or attorney under this protocol. Petitioner contends that the hospital was acting as the State's agent in restraining him. Officer Perry testified that when Petitioner was transferred to the hospital, he contacted the hospital to apprise them of the situation and request that they contact him when Petitioner was awake and able to speak. Officer Perry testified that he did not instruct nor request that the hospital place Petitioner on Silent Status. He further testified that Silent Status was a hospital protocol and not a law enforcement protocol, and any restrictions on the Petitioner were in the full discretion of the hospital. Further, Officer Perry assisted Petitioner's family members with gaining access to Petitioner so they could get paperwork signed in order to bury the victims.

Further, the hospital policies provided by Petitioner in his federal habeas petition state that Silent Status can be requested by the patient, family, doctor, or administration and it is the responsibility of the patient to notify individuals that he/she is in the hospital. It also states that patients on Silent Status are given phone privileges, and if someone inquires about the patient, the hospital is allowed to confirm that the patient is at the hospital, but their specific location and further information is not divulged.  Lastly, medical records indicate that Petitioner was placed on Silent Status due to his suspected suicidal tendencies.  Thus, the hospital was not acting as the State's agent, and the fact that Petitioner was under this protocol does not render him "in custody" during the interrogation.

Petitioner did not cite to any cases in his direct appeal or federal habeas petition where an individual was found to be in custody while medically confined in the hospital. In fact, the Eighth Circuit has recognized that a person is not deemed to be "in custody" simply because he is questioned by the police while in the hospital.  *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (finding that a suspect was not in custody when medically confined to his bed and under medication because the agent told the suspect that he could end the interview at will, did not arrest the suspect, and did not constrain his movements or ability to communicate with hospital staff); *see also State v. Seibert*, 103 S.W. 3d 295, 301 (Mo. App. S.D. 2003) (holding that a suspect confined to the hospital due to his injuries was not in custody because he "was free to terminate the interview and require the officer[s] to leave"); *People v. Jean*, 13 A.D.3d 466, 786 N.Y.S. 564 (2d Dep't 2004) (finding that a defendant was not in custody for *Miranda* purposes when

16

hospital personnel placed defendant in restraints for his own safety and not for the purpose of the police interrogation).[6]

The Court finds that, even though there are compelling factors in support of Petitioner's argument, including his medical inability to leave the room and his repeated requests for an attorney, as a whole, the circumstances surrounding the interrogation did not constrain Petitioner to the degree associated with a formal arrest, and a reasonable person would have felt free to end the interrogation.  Thus, the state court's conclusion that Petitioner was not in custody at the time of his hospital interrogation was a reasonable application of federal law.  Therefore, Ground One is denied for lack of merit.

## Grounds 2 and 3: Petitioner's Statements Were Involuntary

In Grounds 2 and 3, Petitioner argues that his statements to police while at the hospital were involuntary.  Specifically, Petitioner argues that the officers intimidated Petitioner by denying him any communication with his brother and the legal counsel that would have been available through his brother, and coerced him by promoting the false theory to the Petitioner via the hospital staff that Petitioner had attempted suicide.[7]

---

[6]      A determination that an individual is in custody for *Miranda* purposes is often a high threshold.  Even prison inmates are deemed in custody only if subjected to undue additional restraint of their freedom during interrogation.  *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[L]awful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*."); *see also Howes*, 565 U.S. at 515-17 (finding no custody during interview in jail conference room because prisoner was told he was free to leave room.)

[7]      Petitioner argues that the police officers told the hospital upon his arrival that he had attempted suicide which is the only reason the hospital told him his injuries were a result of an attempted suicide. Petitioner therefore argues that his statements and beliefs during the interrogation that he shot himself were instilled by the police.

Procedurally Defaulted Claims

Under the doctrine of procedural default, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by the petitioner of cause for the default and prejudice resulting therefrom, or that he is actually innocent, such that a miscarriage of justice would result by failing to consider the claim. *E.g., Murphy v. King*, 652 F.3d 845, 849-50 (8th Cir. 2011).  In order to exhaust a federal claim, "the petition must present the same facts and legal theories to the state court that he later presents to the federal courts."  *Stephen v. Smith*, 963 F.3d 795, 801 (8th Cir. 2020).

With respect to Ground 2, Petitioner's direct appeal argued that his statements were involuntary due to his medical condition, isolation from his family, and length of the interrogation.  Petitioner's direct appeal and state habeas petition do not argue or even mention that Petitioner's statements were coerced because the hospital staff told him his gunshot wound was self-inflicted.  In Ground 3, Petitioner argues that the involuntary statements in the hospital were used to falsely procure an arrest warrant.  This specific claim, with respect to the arrest warrant, was not raised on direct appeal or in Petitioner's habeas petition.  Petitioner did not allege any facts as to the cause of these defaults or any prejudice resulting therefrom.  However, in Ground 3, Petitioner argues that he is actually innocent.

In Ground 3, Petitioner enumerates various issues with the physical evidence at the scene and claims that these issues "prove beyond a doubt that the [P]etitioner didn't

18

and couldn't have shot his wife, son and himself, and the state's own ballistic,

[Ferrotrace], fingerprint, gun residue, and DNA test results affirm this fact."

When making a claim of actual innocence, "a habeas petitioner [must] present new

evidence that affirmatively demonstrates that he is innocent of the crime for which he

was convicted." *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2016); *see Cassell v. Norris*,

103 F.3d 61, 62 (8th Cir. 1996) ("For actual innocence to lift the procedural bar, [a

petitioner] must show that it is more likely than not that, in light of new evidence, no

reasonable juror would have convicted him.").  This requires the petitioner to present

"new reliable evidence – whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence – that was not presented at trial."

*Schlup v. Delo*, 513 U.S. 298, 324 (1995).

In connection with his assertion, Petitioner has not presented any new evidence; he

merely argues that the evidence, which was presented in trial, was insufficient to prove

his guilt.  As such, Petitioner fails to meet the test for actual innocence.  Moreover, based

on the evidence recited by Petitioner, a jury did in fact convict him.  As such, Petitioner

has failed to demonstrate that he is actually innocent such that a miscarriage of justice

would result by failing to consider these claims.  Thus, Petitioner's claim with respect to

his statements being coerced because he was told his gunshot wound was self-inflicted

and his claim with respect to the validity of his arrest warrant are procedurally defaulted.

Involuntary Statements

In any event, the general issue of whether Petitioner's statements at the hospital

were voluntary was raised on direct appeal.  The state court determined that Petitioner's

statements at the hospital were voluntary.  The state court's "ultimate determination of whether a confession was voluntary presents a question of law."  *Smith v. Bowersox*, 11 F.3d 915, 922 (8th Cir. 2002).  Thus, under the standards set forth in § 2254, the Court must determine whether the state court's application of the law was unreasonable.  28 U.S.C. § 2254(d); *see Gray v. Norman*, 739 F.3d 1113 (8th Cir. 2014) (holding that in order for Petitioner to obtain relief in light of the AEDPA, "he must establish not only that the state court's decision [regarding the voluntariness of his confession] was incorrect, but also that it was unreasonable.").

The Court must examine the totality of the circumstances in determining whether a confession was voluntary.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 224-26 (1973); *United States v. Williams,* 793 F.3d 957, 962 (2015).  Additionally, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Coercion may be mental, as well as physical.  *U.S. v. Kime,* 99 F.3d 870, 879 (8th Cir. 1996).  "The appropriate test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will."  *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990).

The record establishes that Petitioner was alert, conscious, and coherent during the interrogation.  Petitioner assured the officers and nursing staff multiple times that he felt fine when asked.  The officers were only in the Petitioner's room for two hours, and only questioned him intermittently.  Further, Petitioner admitted to being the only one involved in the deaths of his wife and son after just twenty minutes.  *See United States v.*

*LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) ("We place substantial weight on the fact that [the suspect] confessed after a mere thirty-three minutes."). Lastly, the fact that Petitioner chose to answer some of the officer's questions but not others, is strongly indicative that Petitioner's will was not overborne.

With respect to the specific issue raised in Petitioner's federal habeas brief, there is no evidence in the record to suggest that the police officers prohibited Petitioner's brother from seeing him. Petitioner claims that the police "den[ied] his brother, Gerard Joseph, from having any communication with him between the day of the shooting on 5/30/13 and until after [Officers] Perry and Bonham's interrogation on 6/4/13. That was a total of 5 days when the petitioner and his brother were isolated from each other and subsequently from legal counsel through his brother." Doc. No. 1 at 9. As discussed above, Petitioner was placed on Silent Status at the sole discretion of the hospital. Further, Petitioner was not conscious and able to speak until June 4, 2013. Additionally, Petitioner's brother testified that Officers Perry and Bonham actually helped get him into the hospital to see Petitioner. Doc. 11-1 at 179. In any event, even if Petitioner was isolated from his brother for a short period of time, his statements were still voluntary. Petitioner is a college-educated adult who ran his own financial company, and there is no basis in this record to conclude that the lack of his brother's presence at the interview overbore his ability to exercise free and rational will.

Thus, the state court's determination that Petitioner's statements were voluntary was not unreasonable. Ground 2 and Ground 3 are therefore denied for lack of merit.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the petition of George E. Joseph for a writ of habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that this Court will not issue a Certificate of Appealability as Petitioner has not made a substantial showing of the denial of a federal constitutional right as required by 28 U.S.C. § 2253(c)(2).

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G.  FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 9th day of March, 2023.